UNITED STATES COURT OF APPEALS
FOR THE
SECOND CIRCUIT

IN RE: SAIFULLAH KHAN          : CoA No. 24-2794

                              : Trial Docket: 3:19-cv-1966 (KAD/MEG)

                              : NOVEMBER 7, 2024

PROPOSED
REPLY TO RESPONSE BRIEF ON PETITION FOR WRIT OF MANDAMUS

## 1 SUPPLEMENTAL OPERATIVE FACTS

### 1.1 Revised DHS Deadline

On November 4, 2024, late in the afternoon[1], Petitioner received a letter from the Department of Homeland Security (DHS), dated the same date. *See* reply appx. at 14. The letter extends the deadline to submit the transcript at issue in this case until November 25, 2024. *See id.*

### 1.2 The November 7, 2024 Official Transcript Also Identifies Doe by Name

On November 7, 2024, Petitioner received a copy of the transcript at issue in this case, issued by the Court Reporter in New Haven, Connecticut, in the Superior Court of Connecticut, Judicial District of New Haven[2]. The only redactions are

---

[1] Petitioner did not receive the letter until late on November 4, 2024, after Respondents had filed, because he had been away. In the morning of November 5, 2024, Petitioner disclosed the November 4, 2024 letter to Respondents.

[2] The November 7, 2024 transcript ~1285 pages long, and has been filed under seal in the trial court at ECF 223. The final page of each volume authenticates that the transcript was issued November 7, 2024. This transcript was disclosed to Respondents late on November 7, 2024.

Doe's last name on pages 46 and 47.[3] Doe's first name appears, unredacted, more than 740 times and Doe's last name appears, unredacted, 65 times[4].

## 2 REPLY TO RESPONDENTS' CLAIMS OF LAW

### 2.1 No Evidence of Safety Interest for Doe

If there were evidence that Petitioner's speech put Doe in *imminent physical danger*, this might be a closer case. As it stands, however, physical and emotional harm to Doe are speculative. There is no expert testimony as to the likelihood of such harm or the degree of such harm, nor has Doe herself offered testimony as to such harm, nor is there evidence of a history of such harm or treatment because of such harm. Due process would require that Petitioner be allowed to cross examine testimony as to such harm, but there is no such testimony. Respondents' claim of a safety interest is speculative and contested.

### 2.2 Issues are Not Moot in at Least Three Ways

Petitioner's principal brief anticipates this issue in Section 5.1 at pages 15 and 19–20. Briefly, the prior restraint freezes Petitioner's speech. This is an ongoing harm to Petitioner's speech rights *now* and therefore not moot. There are, however, at least three other ways the Petition is not moot. Respondents' claim of mootness is without merit.

---

[3] For whatever reason, this page 47 does not match the version of the redacted transcript submitted to the court by Doe.

[4] Undersigned initially represented the page count as ~1800, but there was a mistake in counting, and the actual page count is ~1285.

2

### 2.2.1 DHS Extended Deadline to November 25, 2024

First, DHS has extended the deadline to comply from October 24, 2024 to November 25, 2024. See reply appx. at 14. A vacatur provides practical relief for Petitioner, allowing him to satisfy that revised deadline. Furthermore, even a late vacatur would allow Petitioner to provide documents as he wishes to DHS.

### 2.2.2 Impossible to Submit Transcript Pursuant to Present Order

Petitioner notes that the October 21, 2024 order states, in relevant part:

> Plaintiff may, in response to the October 3, 2024 letter from USCIS/DHS (ECF No. 201-1), provide a copy of the Official Transcript in *State of Connecticut v. Khan*, No. NNH-CR15-0162194 (Conn. Super. Ct.), which the Court defines as the transcript that redacted Jane Doe's name pursuant to Conn. Gen. Stat. §54-86e, that has been publicly available at least as of July 25, 2024. . . .

> The motion is denied as follows: Plaintiff may not provide, in response to the October 3, 2024 letter from USCIS/DHS . . . the unredacted trial transcripts . . . as the Court does not deem them responsive to the USCIS/DHS letter request.

The Magistrate Judge's definition of the "official transcript" does not comport with the official transcript provided by the Superior Court Reporter on November 7, 2024. The November 7, 2024 transcript is entirely unredacted except for two references to Doe's last name. Doe's name appears unredacted *hundreds* of times. As Petitioner pointed out to the Magistrate Judge, there is no evidence of the existence of the document the Magistrate Judge refers to. There is no document that satisfies the conditions imposed by the Magistrate Judge, and the matter is not moot as Petitioner wishes to respond to DHS.

3

### 2.2.3 Order Prevents Petitioner from Correcting Transcript in Superior Court

Petitioner notes that the October 21, 2024 order also states, in relevant part (emphasis added):

> The Court's Orders regarding the use of Jane Doe's name (ECF Nos. 91, 119) remain in full force and effect, except that Plaintiff is authorized to submit the Official Transcript from Plaintiff's criminal trial to USCIS/DHS, as defined here, provided that **he may not disseminate the transcript to anyone else.**

The Petitioner furthermore notes that the June 19, 2024 precluded disclosure indirectly, "including through counsel . . . ."

Petitioner intends to file a motion in Connecticut Superior Court to have the criminal case put back on the docket so as to correct the improper and illegal alterations to the transcript. On the face of these orders from the Magistrate Judge, Plaintiff is prevented from seeking redress in state court to correct these improper redactions: The orders preclude Plaintiff from distributing copies of such transcripts to the Superior Court, including through legal filings of counsel, to *anyone*. This means counsel will not be able to identify the errors—it isn't even clear whether Petitioner's counsel can even *describe* the errors in the transcript without being violative of the order.

This is a present, ongoing harm that implicates not only the freedom of speech and of the press but also the right to petition for redress of grievances. The matter is not moot.

### 2.3 Risk of Denial of Asylum and Deportation to Afghanistan

Respondents deny that there is a risk of deportation to Afghanistan. They

4

cite no authority. Petitioner respectfully directs attention to the IIRIRA §241(b)(2)—codified at 8 U.S.C. §1231(b)(2)—and *Jama v. ICE*, 543 U.S. 335, 341 (2005)[5].

There is a risk that failing to comply with DHS could jeopardize Petitioner's asylum petition. So to where would he be deported in such an event? Petitioner is a citizen of Afghanistan and only Afghanistan. As the alien, Petitioner could, in theory, designate either the UAE or Pakistan instead of Afghanistan pursuant to (b)(2)(B). However, because he is not a citizen of either country, and has no significant ties to either country, there is no reason to believe either country would accept that request. This leaves the Attorney General to disregard those designations pursuant to (b)(2)(C)(ii) or (b)(2)(C)(iii). According to (b)(2)(D), then, the Attorney General would designate deportation to Afghanistan as Petitioner is a citizen of Afghanistan. Because he is a citizen of Afghanistan, and only Afghanistan, there is no reason to believe that country would refuse to accept him.

## 2.4 Pseudonymity is Not a Compelling Interest nor Lawful Here

Respondents improperly rest their argument in substantial part on the interest in protecting the Magistrate Judge's order of pseudonymity.

### 2.4.1 No Compelling Interest

Privacy interests are surely important. A number of courts have recognized a substantial or important interest in certain privacy rights. *See, e.g., Cox*

---

[5] *See also* Adam L. Fleming, *Around the World in the INA: Designating a Country of Removal in Immigration Proceedings*, Immigration Law Advisor, Vol. 7 No. 5, pp. 1–4, 10–14 (May 2013) reply appx. 14–23.

*Broadcasting Corp. v. Cohn*, 420 U.S. 469, 489 (1975) (recognizing "impressive credentials for a right of privacy"); *Doe v. Gong Xi Fa Cai, Inc.*, No. 19-cv-2678 at 2 (S.D.N.Y. July 10, 2019)(2019 WL 3034793)(acknowledging "important" interest). But this is not a **compelling** interest.

This court should not be misled by Respondents' reliance on cases that actually have a compelling interest. There can be a compelling interest in the context of a criminal prosecution—where there is an interest to protect an ongoing criminal investigation or to protect the judicial process in the context of a criminal proceeding. Respondents improperly rely on these justifications in this case. *See* Doe Brief at 28–29 (citing *Sheppard v. Maxwell* criminal habeas; *US v. Trump* criminal case; *Application of Dow Jones & Co., Inc.* criminal context).

### 2.4.2 Pseudonymity Order is Not Lawful

Respondents improperly rely on the pseudonymity order to justify the prior restraint. The order is not lawful. There are three categories of cases where a pseudonym is used. Respondents rely on all of these categories to justify the pseudonymity order but there are no cases are analogous to this case.

The first category of pseudonymity is a case where the *identity of a defendant is actually unknown prior to litigation*. In that case, a Doe defendant is named as a placeholder. If a true name is revealed only through the discovery process, a court can compel attorneys and parties to keep that information confidential when it is obtained through the discovery process. This is codified in FRCP 26(c). But FRCP 26(c) does not apply to the present case.

6

This is in some ways similar to the second category, protecting the identity of *an anonymous Doe defendant who spoke critically about a government official*, and who is sued by that government official. *See, e.g., Dendrite International, Inc. v. Doe No. 3*, 342 N.J. Super. 134, 775 A.2d 756 (App. Div. 2001)(seminal case); *Doe v. Cahill*, 884 A.2d 451 (Del. 2005)(same). In the context of speech about a government official, there is a fundamental right to anonymously criticize the government, and a court may have a duty to continue to protect that fundamental right by keeping the Doe defendant's identity anonymous. The principle is that the discovery process cannot be used to circumvent the right to criticize government anonymously. But Petitioner is not a government official, and Doe's name was known prior to litigation, so these cases do not apply either.

The third category concerns plaintiffs, not defendants. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185 (2d Cir. 2008) is a ready example, where pseudonyms were used to protect a **plaintiff's** identity. In *Sealed Plaintiff,* the plaintiff was a sex assault victim. That is a situation where the identity of the party seeking the pseudonym *is not known to the public before the lawsuit commences*. This was also the case in *Doe v. Massachusetts Institute of Technology*, 46 F.4th 61 (1st Cir. 2022) as well as *Doe v. Baram*, No. 20-cv-9522 (S.D.N.Y. Aug. 5, 2021)(2021 WL 3423595) and *Doe No. 2 v. Kolko*, 242 F.R.D. 193 (E.D.N.Y. 2006). The interest in such anonymity is in enabling such a plaintiff to seek redress in court. Meritorious cases may otherwise not be heard if such **plaintiff** were not protected.

If Doe were suing Petitioner in this case, she might have a right to proceed under a pseudonym. But she never pursued such a suit and she is not a plaintiff here.

Undersigned can find no cases like the present, where a **defendant** whose identity is known before litigation, whose name appears in public documents, seeks and obtains the right to proceed under a pseudonym. This is an expansion of the law, and in derogation of FRCP Rule 10.

### 2.5 Policy Problem: Expanding Pseudonymity

If Doe is allowed, as a defendant, to compel the Petitioner to not identify Doe, then how will this Court respond when a criminal defendant seeks a similar order to prohibit a USAO from identifying them? Surely the privacy interests for a criminal defendant are at least as strong as that of a defendant like Doe, and unlike Doe, a criminal defendant enjoys a presumption of innocence. There is no limiting principle to the Magistrate Judge's expansion of pseudonymity that prevents such an outcome.

### 2.6 Legal Standards for "Harassment" Neither Briefed or Satisfied

Doe repeatedly claims Plaintiff's speech is or would be "harassment." [6] Plaintiff's speech does not qualify as harassment under state or federal law. Connecticut law defines "harassment" at General Statutes §53a-183 *et seq.* and the term appears in some federal statutes such as 18 U.S.C. §2261A.

---

[6] Petitioner takes strong issue with characterizations and allegations by the Respondents, but for space limitations and in the interest of brevity, Petitioner necessarily focuses on the legal issues rather than the character assassinations, noting only that Respondents rely heavily on statements at oral argument, not actual findings of fact or testimony.

8

What is key under both state and federal law is that for harassment, a speech exception must apply, or the proscription must be applied to non-expressive conduct. *See, e.g., United States v. Yung*, 37 F.4th 70, 75, 80 (3d Cir. 2022)(construing harassment under cyberstalking statute narrowly to avoid First Amendment implications); *State v. Billings*, 217 Conn. App. 1, 34–37, 287 A.3d 146 (2022), cert. denied, 346 Conn. 907, 288 A.3d 217 (2023)(vacating conviction of harassment because speech did not fall within exception); *c.f. United States v. Waggy*, 936 F.3d 1014, 1018 (9th Cir. 2019(considering First Amendment implications as to harassment under cyberstalking law). There is no allegation that simply identifying Doe by name falls within a speech exception.

Criminal harassment-type statutes, if lawfully applied, are a less speech restrictive alternative than the prior restraint here. There is no reason to believe such statutes are not a sufficient deterrent as to any harassment.

## 3 Revised Request for Relief

The Court should vacate the portion of the June 19, 2024 order by the Magistrate Judge that restricts Petitioner's speech and should vacate the October 21, 2024 order by the Magistrate Judge in its entirety.

Given the emergency circumstances, Petitioner respectfully requests judgment by Monday, November 25, 11:30PM EST so that he may comply with the revised request by DHS.

Respectfully submitted,

SAIFULLAH KHAN

NOVEMBER 7, 2024

*/s/ Mario Cerame ct30125*

Mario Cerame
Brignole, Bush & Lewis LLC
73 Wadsworth Street
Hartford, Connecticut 06106
T: 860.527.9973
F: 860.527.5929
E: mario@brignole.com

HIS ATTORNEYS

## <u>CERTIFICATION</u>

       I hereby certify that on November 7, 2024, a copy of the foregoing and attached supporting documents was filed electronically or served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the ACMS System.

       This document complies, to the best of counsel's ability, with the FRAP limitations on word count or pages.  Supporting documents do not exceed 50 pages, and accordingly hard copies are not provided.

       This document contains 2300 words without counting signatures, headings, certifications, or supporting documents.

/s/ _____
Mario Cerame

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on NOVEMBER 7, 2024, a copy of the foregoing was served and documents in support on the following judges, counsel, and parties by way of **ACMS**; in addition to by way of US mail on judges:

The Honorable Kari A. Dooley, United States District Court Judge
United States Courthouse, 915 Lafayette Boulevard, Suite 417
Bridgeport, Connecticut 06604

The Honorable Maria E. Garcia, United States Magistrate Judge
Richard C. Lee United States Courthouse, 141 Church Street
New Haven, CT 06510

Alexander T Taubes, Esq.; alextt@gmail.com

Patrick Noonan, Esq.; pnoonan@carmodylaw.com
Giovanna Weller, Esq.; gweller@carmodylaw.com
Maria Laurato, Esq.; mlaurato@carmodylaw.com

James Sconzo, Esq.; jsconzo@carltonfields.com
Brendan Gooley, Esq.; bgooley@carltonfields.com

Yale University
Peter Salovey
Jonathon Halloway
Marvin Chun
Joe Gordon
David Post
Mark Solomon
Ann Kuhlman
Lynn Cooley
Paul Genecin
Stephanie Spangler
Sarah Demers
Jane Doe
Carole Goldberg

/s/ _____
Mario Cerame

12

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

IN RE: SAIFULLAH KHAN        : CoA No. 24-2794

                            : Trial Docket: 3:19-cv-1966 (KAD/MEG)

                            : NOVEMBER 7, 2024

## <u>APPENDIX TO THE REPLY</u>

November 4, 2024 Letter from DHS ......................................................14

Adam L. Fleming, *Around the World in the INA: Designating a Country of Removal in Immigration Proceedings*, Immigration Law Advisor, Vol. 7 No. 5, pp. 1–4, 10–14 (May 2013). ..........................................................................15

 **U.S. Citizenship and Immigration Services**

**Department of Homeland Security**
Newark Asylum Office
Gateway 3
100 Mulberry Street, Suite 199
Newark, NJ 07102

NAME AND ADDRESS OF APPLICANT
SAIFULLAH KHAN
17 COURT ST
NEW HAVEN, CT 06511

| DATE: 11/04/2024 |
| FILE NO. A 208484528 |
| FORM NO.  I-589 |

Please submit the following additional documentary evidence:

1. You testified that you were arrested in Connecticut in 2015 and that a criminal trial resulted in a Not Guilty Verdict.  Please submit a certificate of disposition regarding your case in criminal court and the official transcript from the court.
2. You testified that you had a protection order filed against you in Dearborn, Indiana that you were able to check online.  Please provide documentation of this protection order.
3. If you are not able to provide any of these documents, please provide a statement explaining the reasons why you were not able to do so.
4. Any other evidence you would like to be considered as part of your claim.

**Be advised that in your efforts to obtain the above-requested documentation, you do not have to inform anyone that you have filed an asylum application. Your asylum application is a confidential matter which should not be disclosed to anyone unless you choose to do so.**

Thank you for your prompt attention to this matter. Please be advised that you must supply the above reasonably available evidence **on or before, November 25, 2024**.

If you have any questions, please contact **Officer Seluga** at (973) 848-3100, and reference **ZNK#435**.

USCIS, Newark Asylum Office
Gateway 3
100 Mulberry Street, Suite 199
Newark, NJ  07102
Fax # 973-848-3101
NewarkAsylumOfficeMailbox@uscis.dhs.gov

Cc:
ROCHELLE CHARNIN
FORMICA PC
195 CHURCH STREET, FLR 11
NEW HAVEN, CT 06510

Form I-72        **PLEASE RETURN THIS LETTER AND ALL ATTACHMENTS WITH**
(REV. 10/05)                              **YOUR RESPONSE**

**U.S. Department of Justice**
Executive Office for Immigration Review

*http://eoir-vll/lib_index.html*
*Published since 2007*



# Immigration Law Advisor

*May 2013*   **A Legal Publication of the Executive Office for Immigration Review**   *Vol. 7 No. 5*

### In this issue...

Page 1:  Feature Article:

*Around the World in the INA: Designating a Country of Removal in Immigration Proceedings*

Page 5:  Federal Court Activity

Page 8:  BIA Precedent Decisions

Page 10:  Regulatory Updates

The Immigration Law Advisor is a professional newsletter of the Executive Office for Immigration Review ("EOIR") that is intended solely as an educational resource to disseminate information on developments in immigration law pertinent to the Immigration Courts and the Board of Immigration Appeals. Any views expressed are those of the authors and do not represent the positions of EOIR, the Department of Justice, the Attorney General, or the U.S. Government. This publication contains no legal advice and may not be construed to create or limit any rights enforceable by law. EOIR will not answer questions concerning the publication's content or how it may pertain to any individual case. Guidance concerning proceedings before EOIR may be found in the Immigration Court Practice Manual and/or the Board of Immigration Appeals Practice Manual.

## Around the World in the INA:
## Designating a Country of Removal in Immigration Proceedings
*by Adam L. Fleming*

Every year the Department of Homeland Security removes hundreds of thousands of aliens from the United States—aliens who hail from more than 170 different countries.[1] Often overlooked in this removal process is the frequently tacit (but always critical) decision as to where exactly the alien should be removed. While it's true that the alien's ultimate destination is not always in dispute, there are occasions when a removal decision's *where* can be as important as its *whether*.

Take, for example, the case of Guglielmo Monte. *Monte v. INS*, 353 F.2d 7 (7th Cir. 1965). Mr. Monte was born in 1910, "in a geographical area listed as Cepich, Pola, which at that time was part of Austria." *Id.* at 7. From 1918 to 1943, however, Mr. Monte's homeland "was under the jurisdiction of Italy." *Id.* at 8. When Mr. Monte entered the United States in 1949—and when he was later placed into deportation proceedings—his birthplace was "within the territorial limits of [the now former] Yugoslavia." *Id.* There was no disagreement regarding Mr. Monte's deportability, but the question remained: *Deportable to where?* When asked to designate his own country of deportation, Mr. Monte himself was at a loss. "You tell me where I can go," he said. "I can't go any place. What country can I go to?" *Id.* (noting that the Government of Yugoslavia refused to accept Mr. Monte).

### Introduction

Selecting a country of removal can involve complex questions of executive authority, foreign law, and individual rights. These issues can arise when the United States chooses not to recognize a "country," *see, e.g.,* *Lee Wei Fang v. Kennedy*, 317 F.2d 180 (D.C. Cir. 1963) (holding that aliens born on the mainland of China prior to the Revolution remained nationals of the Republic of China and not Communist China); or when a country is

overrun by a foreign occupier, *see, e.g.*, *Delaney v. Moraitis*, 136 F.2d 129 (4th Cir. 1943) (holding that Greek nationals should be deported to the Greek Government in exile in England during the Axis occupation);[2] or when a country secedes from another State, *see, e.g.*, *Wani Site v. Holder*, 656 F.3d 590, 594 (7th Cir. 2011) (holding that the Government's assertion "at oral argument that once South Sudan declared its independence, [the Government] may remove [a Sudanese asylum seeker] to that country" was inopportune).

The process of designating a country of removal is governed by sections 241(b)(1) and (2) of the Immigration and Nationality Act, 8 U.S.C. §§ 1231(b)(1) and (2)—which distinguish between aliens placed into proceedings upon arrival and all other aliens. For those who are not arriving aliens, the search for a country of removal begins with the alien's own designation of a country. Section 241(b)(2)(A) of the Act. Under certain circumstances, however, the Government is free to disregard the alien's choice and attempt to remove the alien to one of several different countries. Section 241(b)(2)(C)-(E) of the Act. The process for arriving aliens is relatively more straightforward. The statute's initial goal is to return the alien directly to the country from which he or she embarked. *See* section 241(b)(1)(A) of the Act. If that is not feasible, the statute allows the Government to direct the arriving alien's removal to one of several alternative countries. Section 241(b)(1)(C) of the Act.

This article will attempt to untangle some of the trickiest issues that arise in the designation process. The article will begin with a brief history and overview of the current framework for choosing a country of removal for persons who are not arriving aliens. The article will then discuss that alien's right to designate his or her own country of removal (and when that designation can be disregarded). Next, the article will explain how the Government must select a country of removal if the alien fails to do so properly. And finally, the article will briefly examine the procedures that govern the designation process for arriving aliens.

### History and Overview

Prior to the enactment of the Act, the process of selecting a country of deportation was governed by a "single ill-drawn sentence." *United States ex rel.*

*Karamian v. Curran*, 16 F.2d 958, 960 (2d Cir. 1927); *see also* Immigration Act of February 5, 1917, Pub. L. No. 64-301, § 20, 39 Stat. 874, 890 ("Act of 1917"), *as amended by* Act of July 13, 1943, Pub. L. No. 78-141, 57 Stat. 553. Generally speaking, that sentence provided that aliens were, in the first instance, to be deported to "the country whence they came," and if that failed, the only other option was to "the country of which such aliens are subjects or citizens, or . . . the country [of their last residence]." Act of 1917 § 20, 39 Stat. at 890.

Critics of the previous statute argued that it allowed foreign states to prevent the deportation of their nationals. *See* H.R. Conf. Rep. No. 81-1192, at 7 (1949) ("[O]ver a period of years there have arisen hundreds of cases of aliens . . . who could not be deported because of the failure or refusal of foreign governments to grant passports for their return . . . ."). In April of 1950, the Senate Committee on the Judiciary reported that there were then "3,600 nonenforceable deportation orders" on account of foreign governments refusing to comply with requests for the issuance of travel documents. S. Rep. No. 81-1515, at 637 (1950).

The current mechanism for selecting a country of removal—which was originally enacted as former section 243(a) of the Act, 8 U.S.C. § 1253(a) (1994)—was the product of a persistent campaign to grant the Government more latitude in selecting a country of deportation. Attempts to reform the designation process stalled or failed in the late 1930s and throughout the 1940s. *See* H.R. Conf. Rep. No. 81-1192, at 7-8 (discussing previous bills). Reform proposals were met with fierce resistance from opponents who decried such measures as overbroad and cruel. *See, e.g.*, H.R. Conf. Rep. No. 81-1192, at 18 (arguing the minority views) ("[Under the proposed bill,] deportation may be to any country willing to accept the . . . alien . . . , although the alien may be an utter stranger to that country. Of course, we have the sovereign right to expel any alien, but surely that right must be exercised humanely and decently.").

Nonetheless, the reformers prevailed. The Act was drafted to include a new provision granting the Attorney General expanded alternatives to ensure deportation. *See* *Matter of S-Y-L-*, 9 I&N Dec. 575, 576 (BIA 1962) ("A primary purpose of this section of the 1952 Act was to increase the number of places or countries to which an alien under a final order of deportation might be sent—a

purpose plainly manifested by the language of the Act itself."), *overruled on other grounds*, *Matter of Cheung*, 16 I&N Dec. 690, 692 (BIA 1979).

In more than 60 years, the statutory provisions governing the designation of a country of removal have experienced remarkably little change. *See* former section 243(a) of the Act. However, they were slightly reorganized and reworded for clarity by section 305(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C. of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-600 ("IIRIRA"). The current guidelines for nonarriving aliens can be found in section 241(b)(2) of the Act. The U.S. Supreme Court has instructed courts to read this section as a series of four directives:

> [Section 241(b)(2)] provides four consecutive removal commands: (1) An alien shall be removed to the country of his choice, unless one of the conditions eliminating that command is satisfied; (2) otherwise he shall be removed to the country of which he is a citizen, unless one of the conditions eliminating that command is satisfied; (3) otherwise he shall be removed to one of the countries with which he has a lesser connection; or (4) if that is "impracticable, inadvisable or impossible," he shall be removed to "another country whose government will accept the alien into that country."

*Jama v. ICE*, 543 U.S. 335, 341 (2005) (citations omitted). "The third command, which requires removal to a country of lesser connection under [section 241(b)(2)(E)(i)-(vi)], does not require that the country of removal agree to accept the alien." *Mendis v. Filip*, 554 F.3d 335, 339 n.4 (2d Cir. 2009) (citing *Jama*, 453 U.S. at 342-44).

The Government's discretion to designate a country of removal in commands two through four was formerly vested in the Attorney General. *See Jama*, 543 U.S. at 338 n.1. It is now ultimately vested in the Secretary of the Department of Homeland Security. *Id.* However, the statute and regulations continue to recognize the role of the Immigration Judge in the designation process. *See, e.g.*, 8 C.F.R. § 1240.10(f).

### The Alien's Choice

An alien in removal proceedings (other than one placed into proceedings at the time of arrival) has a right under the statute to "designate one country to which [he or she] wants to be removed." Section 241(b)(2)(A) of the Act; *see also Bui v. INS*, 76 F.3d 268, 270 (9th Cir. 1996) ("[T]he failure to afford an alien this right constitutes reversible error."). As a general rule, the alien is not required to prove that he or she is a citizen or national of the designated country. *See Matter of Laurenzano*, 13 I&N Dec. 636, 638 (BIA 1970). Furthermore, an Immigration Judge cannot disregard the alien's designation without good cause. *See Navarrete-Paredes v. Ashcroft*, 96 F. App'x 348, 350 (6th Cir. 2004) (remanding to resolve an inconsistency between the Immigration Judge's designation of Peru and the alien's designation of Spain); *see also United States ex rel. Scala Di Felice v. Shaughnessy*, 114 F. Supp. 791, 794 (S.D.N.Y. 1953) ("While it is abundantly clear that [the alien's] right of choice . . . no longer exists without qualifications . . . the [Government] may not completely ignore a properly made choice merely as a matter of whim or caprice.").

Still, the Act does place one important limitation on the alien's right: an alien is not permitted to designate "a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States," unless he or she "is a native, citizen, subject, or national of, or has resided in, that designated territory or island." Section 241(b)(2)(B) of the Act. The phrase "adjacent islands" is partially defined by statute as certain enumerated island nations "and other British, French and Netherlands territory or possessions in or bordering on the Caribbean Sea." Section 101(b)(5) of the Act, 8 U.S.C. § 1101(b)(5); *see also Matter of Zoellner*, 15 I&N Dec. 162 (BIA 1974).

The Act provides that the alien's designation may only be disregarded if one of four circumstances is met. *See* section 241(b)(2)(C) of the Act. Briefly stated, these circumstances are: (1) "the alien fails to designate a country promptly," (2) the designated country fails to respond to the Government's inquiry within 30 days, (3) the designated country refuses to accept the alien, and (4) removal to the designated country would be "prejudicial to the United States." *Id.* The existence of any one of the circumstances does not compel the Government to

disregard the alien's designation. *See Jama*, 543 U.S. at 346-47. They merely serve as preconditions for a scenario in which the alien's choice *may* be disregarded. *Id.*

### Failure to Designate Promptly

An alien's designation may be disregarded if "the alien fails to designate a country promptly." Section 241(b)(2)(C)(i) of the Act. This places two requirements on the alien's selection. He or she must choose a "country" and the choice must be made in a timely manner.

The term "country" means, "at a minimum, . . . a foreign place with 'territory' in a geographical sense and a 'government' in the sense of a political organization that exercises power on behalf of the people subjected to its jurisdiction." *Matter of Linnas*, 19 I&N Dec. 302, 304, 307 (BIA 1985) (holding that an alien could not designate the "offices maintained by the Republic of Estonia in New York City" as his country of deportation), *aff'd, Linnas v. INS*, 790 F.2d 1024 (2d Cir. 1986). "Country" has also been defined as "any place possessing a government with authority to accept an alien deported from the United States." *Chan Chuen v. Esperdy*, 285 F.2d 353, 354 (2d Cir. 1960) (holding that an alien could be deported to British-controlled Hong Kong because "Hong Kong [was] a 'country' under [former section 243(a)(7) of the Act]"). The term "country" may have different meanings in different sections of the Act. *See Ng Kam Fook v. Esperdy*, 320 F.2d 86, 88-89 (2d Cir. 1963).

The promptness of an alien's designation is a subjective question. *But see* 8 C.F.R. § 1238.1(c) (stating that an alien placed into removal proceedings under section 238(b) of the Act, 8 U.S.C. § 1228(b), "will have 10 calendar days from service of the Notice of Intent or 13 calendar days if service is by mail, to . . . designate his or her choice of country for removal"). In the general course of affairs, the designation of a country will take place when an alien enters pleadings. The regulations direct the Immigration Judge to notify the alien of his or her right to designate a country of removal during a hearing. 8 C.F.R. § 1240.10(f). After the alien has been afforded "an opportunity then and there to make such designation," the Immigration Judge is required to identify for the record the country (or countries in the alternative) to which the alien shall be removed, if necessary. *Id.*

An alien who designates a country of removal but then requests withholding of removal from that country is deemed to have effectively withdrawn his or her designation. *Matter of Niesel*, 10 I&N Dec. 57, 58 (BIA 1962). In certain circumstances, an alien may be allowed to select a country *after* pleadings have already been entered. However, an alien who has been "afforded a full opportunity to designate a country of deportation at the time of the deportation proceedings"—and who then obstructs his own removal through legal processes and by "refus[ing] to obtain a travel document"—may be found to have waived his right to designate a country. *Ogorodnikov v. U.S. INS*, 995 F.2d 1063 (4th Cir. 1993), 1993 WL 102766, at *2-3 (per curiam) (unpublished table case). If the alien and the Immigration Judge fail to properly designate a country at trial, the Board of Immigration Appeals has the authority "to correct [an] IJ's failure to designate a country of deportation." *Desta v. Ashcroft*, 329 F.3d 1179, 1184-85 (10th Cir. 2003).

Concerns about the timing of an alien's designation have led courts to hold that "aliens do not have an absolute right to *withdraw* a designation." *Desting-Estime v. INS*, 804 F.2d 1439, 1441 (9th Cir. 1986) (emphasis added) (agreeing with *Wong Kam Cheung v. INS*, 408 F.2d 35, 38 (2d Cir. 1969), and *Riasati v. INS*, 738 F.2d 1115, 1120 (10th Cir. 1984)). "The [Government] has discretion, but is not required, to permit an alien to withdraw [his or her designation] . . . ." *Id.* Withdrawal may be permitted "in cases of hardship or possible persecution," but it generally will not be granted when opposed by the Department of Homeland Security. *Riasati*, 738 F.2d at 1120 (holding that an alien who designated France as the country of removal was not allowed to later change his designation to Spain after the Immigration Judge had already directed Iran as the alternative country of removal).

### The Response of the Designated Country (or Lack Thereof)

Even an alien's prompt and proper designation may be disregarded if it fails to receive approval from the designated country. The statute provides two such circumstances that will allow for the alien's choice to be ignored. First, if "the government of the country does not inform the [Secretary of Homeland Security] finally, within 30 days after the date the [Secretary] first inquires, whether the government will accept the alien into the country," the Secretary may designate another country. Section 241(b)(2)(C)(ii) of the Act. And second, if "the

*continued on page 10*

## FEDERAL COURT ACTIVITY

### CIRCUIT COURT DECISIONS FOR APRIL 2013

*by John Guendelsberger*

The United States courts of appeals issued 176 decisions in April 2013 in cases appealed from the Board. The courts affirmed the Board in 153 cases and reversed or remanded in 23, for an overall reversal rate of 13.1%, compared to last month's 15.3%. There were no reversals from the First, Fourth, Fifth, Sixth, and Eighth Circuits.

The chart below shows the results from each circuit for April 2013 based on electronic database reports of published and unpublished decisions.

| Circuit | Total | Affirmed | Reversed | % Reversed |
|---|---|---|---|---|
| First | 2 | 2 | 0 | 0.0 |
| Second | 24 | 22 | 2 | 8.3 |
| Third | 19 | 18 | 1 | 5.3 |
| Fourth | 14 | 14 | 0 | 0.0 |
| Fifth | 5 | 5 | 0 | 0.0 |
| Sixth | 10 | 10 | 0 | 0.0 |
| Seventh | 6 | 4 | 2 | 33.3 |
| Eighth | 6 | 6 | 0 | 0.0 |
| Ninth | 75 | 63 | 12 | 16.0 |
| Tenth | 3 | 2 | 1 | 33.3 |
| Eleventh | 12 | 7 | 5 | 41.7 |
| | | | | |
| All | 176 | 153 | 23 | 13.1 |

The 176 decisions included 91 direct appeals from denials of asylum, withholding, or protection under the Convention Against Torture; 51 direct appeals from denials of other forms of relief from removal or from findings of removal; and 34 appeals from denials of motions to reopen or reconsider. Reversals within each group were as follows:

| | Total | Affirmed | Reversed | % Reversed |
|---|---|---|---|---|
| Asylum | 91 | 80 | 11 | 12.1 |
| Other Relief | 51 | 45 | 6 | 12.0 |
| Motions | 34 | 28 | 6 | 17.6 |

The 11 reversals or remands in asylum cases involved nexus (4 cases), particularly serious crime bar (2 cases), credibility, past persecution, firm resettlement, relocation, and corroboration.

The six reversals or remands in the "other relief" category addressed adjustment of status (two cases), a continuance to obtain counsel, good moral character, U-visas, and limits on section 236(c) mandatory detention.

The six motions cases involved equitable tolling (two cases), changed country conditions (two cases), and motions to reconsider (two cases).

The chart below shows the combined numbers for the first 4 months of 2013 arranged by circuit from highest to lowest rate of reversal.

| Circuit | Total | Affirmed | Reversed | % Reversed |
|---|---|---|---|---|
| Eleventh | 40 | 27 | 13 | 32.5 |
| Tenth | 11 | 8 | 3 | 27.3 |
| Seventh | 29 | 23 | 6 | 20.7 |
| Ninth | 334 | 272 | 62 | 18.6 |
| First | 12 | 10 | 2 | 16.7 |
| Eighth | 15 | 14 | 1 | 6.7 |
| Second | 51 | 48 | 3 | 5.9 |
| Fifth | 41 | 39 | 2 | 4.9 |
| Third | 85 | 81 | 4 | 4.7 |
| Fourth | 42 | 41 | 1 | 2.4 |
| Sixth | 37 | 37 | 0 | 0.0 |
| | | | | |
| All | 697 | 600 | 97 | 13.9 |

Last year's reversal rate at this point (January through April 2012) was 11.0%, with 945 total decisions and 104 reversals.

The numbers by type of case on appeal for the first 4 months of 2013 combined are indicated below.

| | Total | Affirmed | Reversed | % Reversed |
|---|---|---|---|---|
| Asylum | 331 | 277 | 54 | 16.3 |
| Other Relief | 190 | 165 | 25 | 13.2 |
| Motions | 176 | 158 | 18 | 10.2 |

*John Guendelsberger is a Member of the Board of Immigration Appeals.*

# RECENT COURT OPINIONS

### Second Circuit:

*Rosario-Mijangos v. Holder*, Nos. 11-1607-ag, 11-5123-ag, 2013 WL 2096588 (2d Cir. May 16, 2013): The Second Circuit denied a petition for review of the Board's decision affirming an Immigration Judge's denial of cancellation of removal. The petitioner had applied for relief pursuant to section 240A(b)(1) of the Act (providing cancellation of removal for certain nonpermanent residents). The Immigration Judge found the petitioner ineligible because he had failed to maintain a continuous physical presence in this country for at least 10 years preceding his application for relief. Specifically, the petitioner was twice stopped by Department of Homeland Security officials while trying to return from a brief trip to Mexico in 2007. Each time, the petitioner signed a document indicating that he waived his right to appear before an Immigration Judge, wished to return to his country, and did not fear harm there. At the removal hearing, the Immigration Judge heard testimony from the petitioner and two border patrol agents regarding the usual practices followed when a person is apprehended at the border. Although the petitioner claimed he did not waive his right to a hearing and agree to return to Mexico, the Immigration Judge concluded that the petitioner made an informed decision to accept a "voluntary return" to Mexico in hopes of expediting his return to his home and family. The judge therefore ruled that the formal, documented nature of the petitioner's two departures were interruptive of his continuous physical presence. The circuit court agreed, concurring with the Board's conclusion that the Immigration Judge's factual findings were not clearly erroneous. Turning to the Board's legal findings, the court noted that it had accorded *Chevron* deference to the Board's precedent decisions in *Matter of Romalez*, 23 I&N Dec. 423 (BIA 2002) (en banc), and *Matter of Avilez*, 23 I&N Dec. 799 (BIA 2005) (en banc). Applying the holdings of those cases, the court stated that it must affirm the Board's decision if it found that the petitioner was determined to be inadmissible pursuant to a "formal, documented process." The court disagreed with the petitioner's contention that a "formal process" refers only to procedures specifically designated by statute or regulation. The court found that the voluntary return procedure followed in the petitioner's case precisely fit the criteria laid out by the Board in *Avilez*, noting that the Seventh, Ninth, and Tenth Circuits have also agreed with the Board on this issue.

### Fourth Circuit:

*Karimi v. Holder*, Nos. 11-1929, 12-1076, 2013 WL 1943791 (4th Cir. May 13, 2013): The Fourth Circuit granted a petition for review and vacated the Board's decision affirming an Immigration Judge's order of removal. The petitioner, an asylee from Afghanistan, was placed into removal proceedings following his conviction for misdemeanor second-degree assault under Maryland Annotated Code, Criminal Law section 3-203. Upon his guilty plea, the petitioner was sentenced to 3 years' imprisonment, of which all but 4 months were suspended. The Immigration Judge found (and the Board affirmed) that the petitioner was removable because his conviction satisfied the definition of a crime of violence under 18 U.S.C. § 16 and the sentence exceeded 1 year, and therefore the conviction was for an aggravated felony. On review, the circuit court first discussed whether the Maryland statute (which is defined by reference to common law elements) is divisible and thus subject to the modified categorical approach. The court ultimately found it unnecessary to decide this issue, determining that under either the strict categorical or the modified categorical approach, the conviction in question was not for an aggravated felony. The court noted that under the former approach, the Maryland statute covers both violent and nonviolent touching. As to the modified categorical approach, the court observed that the Immigration Judge relied on information contained in the arresting officer's affidavit, which had been incorporated into the charging document. The court stated that such a document could be properly considered under the modified categorical approach. However, the court observed (1) that the petitioner's guilty plea did not admit to the portion of the officer's affidavit that related to violent conduct; (2) that the alleged violent conduct was not inherent in the guilty plea; and (3) that the officer's allegation was not mentioned by the criminal prosecutor as evidence to be presented at trial. Accordingly, the court found that the document had insufficient weight to support the aggravated felony charge.

### Fifth Circuit:

*Dhuka v. Holder*, No.12-60169, 2013 WL 1859084 (5th Cir. May 3, 2013): The Fifth Circuit affirmed the Board's denial of a family's application for adjustment of status. After entering the United States as B-2 visitors, the family changed their nonimmigrant status to that of L-1A multination manager for the adult male petitioner and L-2 dependents for his wife and son.

While still in valid nonimmigrant status, the family filed applications for adjustment of status in conjunction with an I-140 immigrant visa petition filed on the adult male petitioner's behalf. The family's L status expired in August 2004; however, they remained in the country beyond that date awaiting the adjudication of their adjustment applications. Just over a year later, the adjustment applications were denied by the Department of Homeland Security ("DHS"). The petitioners filed a motion to reopen a month later, acknowledging errors in the original application. The motion was denied by the DHS 2 weeks later. In March 2006, the petitioners again filed for adjustment of status, this time based on an I-140 filed on behalf of the female petitioner's employment as a nurse. The DHS denied the applications because the petitioners had been out of lawful status for more than 180 days. The petitioners were subsequently placed into removal proceedings, charged as aliens who remained in the United States longer than permitted, and sought to renew their adjustment applications before the Immigration Judge. However, the Immigration Judge denied the applications because of the long period of time that petitioners were not in lawful status. The Board affirmed on appeal. The issue before the circuit court was the status of the petitioners from the date their L visas had expired (August 2, 2004) until they filed their second applications for adjustment of status (March 10, 2006), a period well in excess of 180 days. Under the Board's precedent decision in *Matter of L-K-*, 23 I&N Dec. 677 (BIA 2004), the petitioners were in "technical violation" of their legal status while they awaited a decision on their first adjustment applications (i.e., until September 2005). The court found reasonable the Board's determination that while that "technical violation" period would not create an impediment to adjustment if the adjustment application is subsequently granted by the DHS, where, as here, the application was denied, that period cannot later be counted as time spent in lawful status.

### Seventh Circuit:

*Chen v. Holder*, No. 12-2563, 2013 WL 1908017 (7th Cir. May 9, 2013): The Seventh Circuit granted the petition for review of the Board's denial of an asylum claim from China. The petitioner's fear of persecution was based on the birth of two sons in the United States. According to the petitioner, authorities in her village learned of the births, revoked her registration, and ordered her to report for sterilization. In affirming the Immigration Judge's denial of asylum, the Board did not find that the

country materials in evidence supported the petitioner's claimed fear of involuntary sterilization. The Board also did not give weight to letters from family members or to unauthenticated communications from local authorities in China. The circuit court took a different view of the weight that should be afforded to the documentary evidence and how its contents should be interpreted. For example, the court found the statement in the State Department's May 2007 *Country Profile* that there have been no cases of forced abortions or sterilization in Fujian province in the prior 10 years to be rendered less persuasive by the fact that this information was credited to local Fujianese officials and, according to the report, was impossible to confirm. The court also held that a broader concept of authentication exists in immigration proceedings than the standard employed by the Board. The court held that a document posted on a government website is presumed authentic where "government sponsorship can be verified by visiting the website itself." The court accordingly vacated the Board's decision and remanded.

### Eighth Circuit:

*Alavez-Hernandez v. Holder*, No. 12-1940, 2013 WL 1891337 (8th Cir. May 8, 2013): The Eighth Circuit denied the petition for review of the Board's decision affirming an Immigration Judge's denial of asylum from Mexico. The petitioners, a husband and wife from Mexico, claimed to have suffered persecution at the hands of Catholics in their home village, because they are members of Evangelical Christian families. The petitioners relocated to Oaxaca City for 9 years, where they claimed their Zapotec ethnicity and lack of Spanish language fluency limited their employment opportunities. Both the Immigration Judge and the Board found that the harm suffered by the petitioners in their village and the economic difficulties in Oaxaca did not rise to the level of persecution, and that the petitioners could avoid future persecution by relocating to Oaxaca City. Observing that circuit case law requires harm to be "severe enough to threaten an applicant's life or freedom" in order to constitute persecution, the court agreed with the Immigration Judge and Board that the mistreatment suffered by the petitioners did not reach this standard. The court continued that even assuming the standard had been met, the Board was correct in concluding that the petitioners could avoid future persecution by relocating to Oaxaca City. The court was not persuaded by the petitioners' argument that their limited employment

opportunities there would make such relocation unreasonable. The court noted that the petitioners' family members continue to live in Oaxaca, and "have been able to establish lives there." And noting that the primary reason claimed for their lack of job opportunities in Oaxaca was their lack of Spanish language skills, the court observed that the petitioners testified before the Immigration Judge in Spanish, indicating an increased proficiency in that language since they last resided there.

### Ninth Circuit:

*Olivas-Motta v. Holder*, No. 10-72459, 2013 WL 2128318 (9th Cir. May 17, 2013): The Ninth Circuit vacated the Board's decision affirming an Immigration Judge's finding that a conviction for endangerment under Arizona law was a crime involving moral turpitude ("CIMT"). In reaching that conclusion, the Board (and the Immigration Judge) relied on the Attorney General's decision in *Matter of Silva-Trevino*, 24 I&N Dec. 687 (A.G. 2008). Specifically, the Immigration Judge relied on information contained in three police reports offered into evidence by the DHS to conclude that the petitioner's conduct constituted a CIMT. The Board found the reliance on these reports permissible under *Silva-Trevino*, in which the Attorney General held that because "moral turpitude" is not an element of an offense and may not be discernible in all cases from the record of conviction alone, an Immigration Judge may consider evidence outside of the record of conviction in order to determine if the crime in question involved moral turpitude. The Ninth Circuit disagreed. First, the court distinguished between "substance and procedure," ruling that "[t]here is nothing in the substantive definition of a CIMT . . . that permits an [Immigration Judge] to use a different procedure than it uses for other crimes in determining whether an alien has been convicted of such a crime." The court next reached a different definition of "convicted of" than that employed in *Silva-Trevino*. The court stated that an alien is convicted of "only those acts that form the basis for the conviction, as shown by the record of his conviction." The court concluded that reliance on documents outside of the record of conviction could result in a reliance on acts that the alien may have committed, but that did not form the basis for the conviction. Additionally, the court applied the analysis of the Supreme Court in *Nijhawan v. Holder*, 129 S. Ct. 2294 (2009), to conclude that the term "involving moral turpitude" constitutes an element of the crime, rather than a description of circumstances. The court thus determined that *Silva-Trevino* should

not be accorded *Chevron* deference and remanded the record. The case was decided by a three-judge panel, with one judge concurring in the result but concluding that although *Silva-Trevino* was misapplied in the present case, the Attorney General's decision in that case was reasonable and was neither arbitrary nor capricious.

*United States v. Sandoval-Orellana*, No. 12-50095, 2013 WL 1908884 (9th Cir. May 9, 2013): In a case arising in the criminal context of an appeal from a U.S. district court conviction for illegal reentry after deportation, the Ninth Circuit affirmed the petitioner's underlying order of removal as an aggravated felon under section 237(a)(2)(A)(iii) of the Act. The petitioner's prior removal order had been based on his 2003 conviction for "sexual penetration by foreign object" in violation of section 289(a)(1) of the California Penal Code. The Immigration Judge had found the petitioner's conviction to be for a crime of violence under section 101(a)(43)(F) of the Act. Applying the categorical approach, the court noted that section 101(a)(43)(F) applies the definition of "crime of violence" found in 18 U.S.C. § 16, which does not require the actual use of violence, but rather a substantial risk that violent physical force may be used. Noting that the California statute in question requires the sexual penetration to be accomplished against the victim's will, the court concluded that while this may be accomplished without actual violence, it will always involve a substantial risk of violent physical force. While the court acknowledged hypotheticals presented by the petitioner in which no substantial risk of violence would theoretically arise, the court held that to consider such unusual examples would run contrary to the Supreme Court's holding in *James v. United States*, 550 U.S. 192 (2007), which requires considering whether such risk would necessarily arise "in the ordinary case."

## BIA PRECEDENT DECISIONS

In *Matter of Montoya-Silva*, 26 I&N Dec. 123 (BIA 2013), the Board held that a parent's period of lawful permanent residence in the United States cannot be imputed to an unemancipated minor to establish the 7 years of continuous residence required for cancellation of removal under section 240A(a)(2) of the Act, reaffirming its prior decisions in *Matter of Escobar*, 24 I&N Dec. 231 (BIA 2007), and *Matter of Ramirez-Vargas*, 24 I&N Dec. 599 (BIA 2008).

The respondent, who had been found removable under section 212(a)(6)(E)(i) of the Act, applied for cancellation of removal under section 240A(a). Because she was served with a notice to appear about 5 years after her admission to the United States, she was unable to satisfy the 7 years' continuous residence requirement and sought imputation of her mother's period of lawful permanent residence, citing the Ninth Circuit's decision in *Mercado-Zazueta v. Holder*, 580 F.3d 1102 (9th Cir. 2009). The Immigration Judge found *Mercado-Zazueta v. Holder* to be distinguishable, because that case limited imputation to situations where, unlike the respondent, the child resided in the United States with the parent. The Immigration Judge found the respondent to be ineligible for section 240A(a) cancellation of removal and denied her application.

During the pendency of this appeal, the Supreme Court decided *Holder v. Martinez Gutierrez*, 132 S. Ct. 2011 (2012), and found that the Board's construction of section 240A(a)'s eligibility requirements, as explained in *Matter of Escobar* and *Matter of Ramirez-Vargas*, was reasonable and entitled to deference under *Chevron, U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984). The Supreme Court expressly abrogated the Ninth Circuit's decisions in *Mercado-Zazueta v. Holder* and *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013 (9th Cir. 2005), which similarly held that a parent's period of continuous residence could be imputed to a child for purposes of cancellation of removal. Applying the reasoning of *Matter of Ramirez-Vargas* to this case, the Board concurred with the Immigration Judge that the respondent could not impute her mother's period of lawful period of residence and therefore had not established eligibility for cancellation of removal. The appeal was dismissed.

In *Matter of B-R-*, 26 I&N Dec. 119 (BIA 2013), the Board held that an alien who is a citizen or national of more than one country but has no fear of persecution in one of the countries is not a "refugee" within the meaning of in section 101(a)(42) of the Act and thus is ineligible for asylum.

The respondent, who held dual citizenship in Venezuela and Spain, sought asylum based on persecution he claimed he experienced in Venezuela. The Immigration Judge denied the respondent's application, finding that since he could live safely in Spain, he was not a "refugee" as contemplated by the Act.

On appeal, the Board agreed with the respondent that his asylum claim was not barred by either the "safe third country" exception in section 208(a)(2)(A) of the Act or by the "firm resettlement" exception under section 208(b)(2)(A)(vi). However, the Board rejected the respondent's contention that the definition of "refugee" does not require that an alien establish persecution in every country to which he may be returned. Examining the legislative history of section 101(a)(42) of the Act, the Board observed that Congress crafted the definition relying on language in the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150. The Convention stated that when a person has more than one nationality, the term "country of nationality" means each of the countries of which he or she is a national. Therefore the person will not be considered lacking the protection of the country of his or her nationality if the person has not availed himself or herself of the protection of one of the countries of nationality.

Noting that the Convention's construction was consistent with the history of the Refugee Act, the Board pointed out that the Senate Report to the Refugee Act of 1980 clarified that the phrase "any country" in section 101(a)(42) of the Act referred to eliminating restrictions which had constrained conditional entrant refugees to those from Middle Eastern or Communist countries. Observing that the purpose of asylum is to protect refugees who have nowhere else to turn, rather than to provide applicants with a broader choice of safe homelands, the Board reasoned that this principle was reflected in the language of the Convention, as well as in the firm resettlement and safe third country provisions of the Act. The Board also pointed out that a grant of asylum may be terminated pursuant to section 208(c)(2)(E) of the Act if an alien acquires a new nationality and enjoys the protection of that country.

Turning to section 241(b)(2)(D)(ii) of the Act, the Board noted that the Secretary of the Department of Homeland Security has authority to remove an alien to "a country" of which the alien is a subject, national, or citizen. Reading the phrase "a country" to refer to any country of citizenship, nationality, or of which an alien is a subject, the Board concluded that Congress indicated that an alien can be physically removed to only one country, even though there may be more than one alternative.

The Board concluded that the respondent had the option to reside in Spain as a citizen or national, and once nationality was established, he bore the burden of demonstrating that he could not obtain protection in that alternative country. Since the respondent had not argued that he had unsuccessfully availed himself of Spain's protection, the Board held that he is not a refugee as defined in section 101(a)(42) of the Act, and that he is ineligible for asylum. The appeal was dismissed.

## REGULATORY UPDATE

**78 Fed. Reg. 28,124 (May 14, 2013)**
**DEPARTMENT OF JUSTICE**
**Executive Office for Immigration Review**

8 CFR Part 1292

**Registry for Attorneys and Representatives**

ACTION: Notice of implementation of registration requirement.
SUMMARY: The Executive Office for Immigration Review (EOIR) has established a mandatory electronic registry for attorneys and accredited representatives who practice before EOIR's immigration courts and Board of Immigration Appeals (BIA or Board). This notice provides additional instructions regarding the registration process.
DATES: Attorneys and accredited representatives will be able to register beginning on June 10, 2013. After December 10, 2013, attorneys and accredited representatives must be registered in order to practice before EOIR's immigration courts and the Board and may be subject to administrative suspension for failure to register.

**78 Fed. Reg. 32,533 (May 30, 2013)**
**UNITED STATES SENTENCING COMMISSION**

**Sentencing Guidelines for United States Courts**
ACTION: Notice of proposed priorities. Request for public comment.
SUMMARY: As part of its statutory authority and responsibility to analyze sentencing issues, including operation of the federal sentencing guidelines, and in accordance with Rule 5.2 of its Rules of Practice and Procedure, the United States Sentencing Commission is seeking comment on possible priority policy issues for the amendment cycle ending May 1, 2014.
DATES: Public comment should be received on or before July 15, 2013.

**78 Fed. Reg. 26,101 (May 3, 2013)**
**DEPARTMENT OF STATE**

**In the Matter of the Review of the Designation of Real Irish Republican Army and Other Aliases; As a Foreign Terrorist Organization Pursuant to Section 219 of the Immigration and Nationality Act, as Amended**

Based upon a review of the Administrative Records assembled in these matters pursuant to Section 219(a)(4)(C) of the Immigration and Nationality Act, as amended (8 U.S.C. 1189(a)(4)(C)) ("INA"), and in consultation with the Attorney General and the Secretary of the Treasury, I conclude that the circumstances that were the basis for the 2008 decision to maintain the designation of the aforementioned organization as a foreign terrorist organization has not changed in such a manner as to warrant revocation of the designation and that the national security of the United States does not warrant a revocation of the designation.

Therefore, I hereby determine that the designation of RIRA as foreign terrorist organization, pursuant to Section 219 of the INA (8 U.S.C. 1189), shall be maintained.

This determination shall be published in the **Federal Register**.

Dated: April 26, 2013.
John F. Kerry,
Secretary of State.

**Around the World in the INA:** *continued*

government of the country is not willing to accept the alien into the country," the Department of Homeland Security may go forward with its own selection. Section 241(b)(2)(C)(iii) of the Act. *But see Matter of Maccaud*, 14 I&N Dec. 429, 431 (BIA 1973) (noting that an affirmative refusal is not required if the time period specified by the statute has already passed).[3] Where there is "some doubt as to the validity of [a respondent's] claim to [foreign] citizenship," the country's statement of its willingness to accept the respondent must be unconditional. *Maccaud*, 14 I&N Dec. at 432.

*Selections Prejudicial to the United States*

The final circumstance that allows the Government to disregard the alien's designation is when removal of "the alien to the country is prejudicial to the United States." Section 241(b)(2)(C)(iv) of the Act. The discretion granted to the Government under

this provision applies to a variety of situations. For instance, the Immigration Judge may disregard an alien's designation where it is "not made in good faith." *Ngai Chi Lam v. Esperdy*, 411 F.2d 310, 311-12 (2d Cir. 1969) (rejecting a crewman's designation of Rhodesia on the grounds that the alien had no contacts with Rhodesia and "knew full well that his designation . . . was abortive ab initio"); *see also Lam Tat Sin v. Esperdy*, 334 F.2d 999, 1001 (2d Cir. 1964).

The Immigration Judge may also ignore a designation that runs contrary to the foreign policy of the United States. In this regard, the Department of State's "opinion [on foreign policy is] the only one that is relevant to the issue of whether [a] respondent's deportation . . . would violate United States foreign policy." *Linnas*, 19 I&N Dec. at 309. The most prominent example of an alien's designation being disregarded on foreign policy grounds involved the deportation of Joseph Patrick Doherty, a man convicted in the United Kingdom of collaborating with other members of the Provisional Irish Republican Army to kill a British Army captain. *See INS v. Doherty*, 502 U.S. 314, 317-18 (1992).

In his deportation proceedings, Mr. Doherty—a native of Northern Ireland and citizen of the United Kingdom—designated the Republic of Ireland as his country of deportation. *Doherty v. Thornburgh*, 943 F.2d 204, 206 (2d Cir. 1991). Despite an objection from the former Immigration and Naturalization Service, the Immigration Judge and the Board accepted Mr. Doherty's designation. *Id.* at 207. However, former Attorney General Edwin Meese overruled the designation "on the basis that [Mr. Doherty] committed a serious crime in the United Kingdom and therefore to deport [him] to any country other than the United Kingdom to serve his sentence would harm the interests of the United States." *Doherty*, 502 U.S. at 320. The United States Court of Appeals for the Second Circuit upheld the Attorney General's decision, noting that "[C]ongress left the attorney general broad discretion to determine what constitutes prejudice to national interests." *Doherty v. U.S. Dep't of Justice, INS*, 908 F.2d 1108, 1113 (2d Cir. 1990), *rev'd on other grounds*, 502 U.S. 314.

Because "the statute provides no guidelines for determining what type of 'prejudice' enables the attorney general to act," it is essentially a political question, unreviewable by a circuit court. *Id.* The Board has noted

the Second Circuit's finding that the Government has "broad discretion to determine what constitutes prejudice to national interests." *Matter of Ruiz-Massieu*, 22 I&N Dec. 833, 847 (BIA 1999) (citing to the *Doherty* cases in an appeal arising in the Third Circuit).

### The Government's Turn

If the alien fails or refuses to designate a proper country, the statute "reposes very broad discretion in the [Government] to designate the removal country." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1295 (11th Cir. 2001) (citing *Ademi v. INS*, 31 F.3d 517, 520-21 (7th Cir. 1994)); *see also Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir. 2005). However, this discretion is not completely unfettered. *See Wani Site*, 656 F.3d at 594. The Government must progress through the statute's three remaining commands in the order that they appear in the statute. *See* section 241(b)(2)(D), (E) of the Act; *Jama*, 543 U.S. at 341.

This means that the Immigration Judge must first direct the alien's removal to "a country of which the alien is a subject, national, or citizen." Section 241(b)(2)(D) of the Act (the statute's second command). If that fails, the Immigration Judge must order the alien removed to one of six "[a]dditional removal countries" provided in the statute's third command. Section 241(b)(2)(E)(i)-(vi) of the Act. Finally, under the fourth command, if removal to all other countries proves "impracticable, inadvisable, or impossible," the Immigration Judge is required to direct the alien's removal to "another country whose government will accept the alien into that country." Section 241(b)(2)(E)(vii) of the Act. The Immigration Judge is not permitted to take these steps out of order. *See Hadera v. Gonzales*, 494 F.3d 1154, 1157-58 (9th Cir. 2007) (holding that the Immigration Judge erred in designating Ethiopia (instead of Italy) where no country met the requirements of the second command and only Italy met the requirements of the third command).

### Subject, National, or Citizen

The statute's second command calls for the alien to be removed to his or her country of citizenship or nationality *unless* that country "is not willing to accept the alien" or fails to respond "within 30 days after the date the [the Secretary of Homeland Security] first

inquires." Section 241(b)(2)(D) of the Act (stating that the Government may set a another period of time that it deems reasonable for a response).[4] If an alien is a subject, national, or citizen of more than one country, the Government may remove that alien to any of the countries of which he or she is a subject, national, or citizen. *Matter of B-R-*, 26 I&N Dec. 119, 122 (BIA 2013).

This section is sometimes unenforceable—either because the alien is stateless or the alien's nationality cannot be conclusively established. Possession of a foreign passport is not necessarily proof of citizenship of the foreign state. *See Maccaud*, 14 I&N Dec. at 431 (analyzing an alien's claim to Irish citizenship in an analogous context). An alien who "stead-fastly rejects any allegiance" to a country that has annexed his native territory is not a "subject, national, or citizen" of that country. *Linnas*, 19 I&N at 308.

The second command must be bypassed when the alien's own actions make it impossible to determine his or her nationality. This proposition was well illustrated by the case of Benji Macaulay. *See Macaulay v. Gonzale[s]*, 181 F. App'x 395 (5th Cir. 2006). Mr. Macaulay's nationality was unknown and he had "no passport, birth certificate, or other documents to verify his citizenship." *Id.* at 396. He was first known to have resided in England, where he was adopted by a Nigerian couple, but he later ran away to France. *Id.* He then "spent several years in Western Europe, during which time he claimed Nigerian citizenship to obtain cash benefits granted by the German government." *Id.* After entering the United States in 1990, Mr. Macaulay "used nearly two dozen aliases and . . . claimed various birth dates, places of birth, [S]ocial [S]ecurity numbers, and driver's license numbers." *Id.* An Immigration Judge ultimately ordered Mr. Macaulay removed to Nigeria (under the *third* command) because the best evidence in the record connected him with that country. *Id.* at 397.

*Countries of a Lesser Connection*

If removal to the alien's country of citizenship or nationality is not possible, the statute's third command provides six types of additional removal countries to which removal can be directed. *See* section 241(b)(2)(E)(i)-(vi) of the Act. According to the statute, an alien may be removed to: (1) the country from which the alien was admitted to the United States;

(2) the country that contains the foreign port from which the alien left for the United States; (3) the country in which the alien last resided; (4) the country in which the alien was born; (5) the country that had sovereignty over the alien's birthplace when he or she was born; or (6) the country in which the alien's birthplace is located at the time of removal. *Id.* Removal may be directed under this step "without necessarily giving any priority or preference because of their order, to any one of [the six] categories of countries." *Matter of Fwu*, 17 I&N Dec. 354, 356 (BIA 1980) (quoting *Cheung*, 16 I&N Dec. at 691) (internal quotation mark omitted).

The Government's discretion under this section is quite broad. *See Matter of Ng*, 10 I&N Dec. 428, 429-30 (BIA 1963) (affirming the Immigration Judge's designation of the Netherlands as the country of removal for a Chinese crewman who arrived in the United States aboard a Dutch vessel). The respondent need not be a citizen, national, or subject of the designated country and, "[m]oreover, . . . an alien may be removed under any of subsections (i) through (vi) without the prior consent of the government of the country designated for removal." *Bejet-Viali Al-Jojo v. Gonzales*, 424 F.3d 823, 828 (8th Cir. 2005) (citing *Jama*, 543 U.S. 335); *see also* 8 C.F.R. § 241.15(e).[5] In fact, the regulations provide that "the existence of a functioning government [in the country of removal] is not required." 8 C.F.R. § 1240.10(f). Furthermore, the Immigration Judge may designate "multiple countries of removal either in the alternative or in combination . . . as long as the countries designated [are properly chosen]." *El Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004) (citing 8 C.F.R. § 1240.12(c)). The statute does not require that an alien "have an opportunity to contest the designation of [a country] as the country of removal . . . . The statute only requires that the Immigration Judge designate the proper country of removal based on the guidelines provided." *Jah v. Gonzales*, 165 F. App'x 50, 52 (2d Cir. 2006).[6]

The outer limits of the Government's discretion are not clearly delineated by the statute, but they do exist. For example, the Second Circuit has held that sections 241(b)(2)(E)(i) and (ii) are "ambiguous, and . . . neither clearly authorizes [an alien's] removal to [a country that the alien merely stopped in en route to the United States]." *Mendis*, 554 F.3d at 340. And however broad the Government's discretion may be, the statute clearly anticipates a scenario in which no country will qualify

under these provisions. For that there is the fourth (and final) command.

### Any Country Willing To Accept the Alien

Under the statute's final step—where removal to all other countries is "impracticable, inadvisable, or impossible"—the Government is permitted to seek removal to "another country whose government will accept the alien into that country." Section 241(b)(2)(E)(vii) of the Act. Where only one country is willing to accept the alien, that country is a proper designation under the Act. *See Linnas*, 19 I&N Dec. at 308-09. The sole issue is whether the government of the country is willing to accept the alien. *See Wangchuck v. DHS*, 448 F.3d 524, 531 (2d Cir. 2006) (holding that the Board erred in ordering an alien—who was born in India to Tibetan parents—removed to China without evidence that China would accept him); *El Himri*, 378 F.3d at 934, 939 (holding that "stateless Palestinians who fled Kuwait" could not be removed to Jordan unless that country was willing to accept them).

Section 241(b)(2)(E)(vii) surely represents the zenith of the Government's discretion in locating a country to which an alien may be removed. In fact, the Fifth Circuit has held that an order of removal that simply orders the alien removed "to such nation as may accept him" is facially valid under the Act. *Abdallah v. Gonzales*, 132 F. App'x 12, 14 (5th Cir. 2005) (per curiam). And the D.C. Circuit has held that the Government is not required, "as a condition of deportation, . . . to assure that once accepted the deportee will be granted permanent residence or asylum within the accepting country." *Teo Chai Tiam v. Kennedy*, 293 F.2d 543, 545 (D.C. Cir. 1961) (quoting *United States ex rel. Tie Sing Eng v. Murff*, 165 F. Supp. 633, 644 (S.D.N.Y. 1958)) (internal quotation marks omitted).

### Arriving Aliens

An alien who is placed into removal proceedings at the time of his or her arrival at the United States is not subject to the statutory framework that applies to all other aliens in removal proceedings. *See* section 241(b)(1)(A) of the Act. The principal difference for these arriving aliens is that they are not given an opportunity to designate their own countries of removal. *See id.*

The current statutory framework—which is found in section 241(b)(1)—replaced former section 237(a), a "deceptively simple formula" that was designed to return excludable aliens to the country "whence [they] came." *Menon v. Esperdy*, 413 F.2d 644, 646, 653 (2d Cir. 1969) (quoting former section 237(a) and criticizing it as "an anachronistic relic which in its operative language dates back at least as far as the 1882 Chinese Exclusion Act"); *see also* IIRIRA § 305(a), 110 Stat. at 3009-600. Under the prior statute, attempts to determine "whence an alien came" could sometimes lead to absurd results. *See Menon*, 413 F.2d at 652 (citing *Stacher v. Rosenberg*, 216 F. Supp. 511, 514 (S.D. Cal.1963), in which the court "had no alternative but to conclude that the *United States* was the country of deportation" (emphasis added)).

Section 241(b)(1) now provides three steps for the designation of the arriving alien's country of removal. In the first step, removal is directed to "the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States." Section 241(b)(1)(A) of the Act. *But see* section 241(b)(1)(B) of the Act (applying the limitation that only natives, citizens, subjects, and nationals of foreign territory contiguous to the United States or adjacent islands may be removed to those countries or territories). The Government is not required to obtain the consent of the receiving country under this section of the Act. *See Gamado v. Chertoff*, No. Civ.A.07-4217 (JLL), 2008 WL 2050842, at *2 (D.N.J. May 12, 2008) (unpublished table case).

If the country of embarkation is unwilling to accept the alien, the Government is required to direct removal to one of three types of countries: (1) the alien's country of citizenship or nationality, (2) the alien's country of nativity, or (3) the alien's country of residence. Section 241(b)(1)(C)(i)-(iii) of the Act; *see also* 8 C.F.R. §§ 241.15(e), 1240.10(f) (stating that acceptance of the receiving country is not required under these sections). As with all other aliens, if removal to the enumerated countries is "impracticable, inadvisable, or impossible," the Government ultimately must seek removal to any "country with a government that will accept the alien into the country's territory." Section 241(b)(1)(C)(iv) of the Act. The designation process for these arriving aliens has been the subject of much less litigation than the provisions of section 241(b)(2).

**Conclusion**

One of the Act's primary goals was "to reduce the number of undeportables by increasing the number of places or countries to which an alien . . . might be sent." *Ying v. Kennedy*, 292 F.2d 740, 743 (D.C. 1961). To that end, the Act gives adjudicators a plethora of options to ensure that removable aliens can be effectively removed. But this latitude is not infinite. Courts should continue to consult the statute to confirm that the country of removal (designated by the alien or requested by the Government) is permissible and appropriate.

*Adam L. Fleming is the attorney advisor for the Buffalo and Batavia Immigration Courts, in New York State.*

1. *See* Dep't of Homeland Security, *Yearbook of Immigration Statistics – Table 41 (Aliens Removed by Criminal Status and Region and Country of Nationality: Fiscal Years 2002 to 2011)* (Jan. 2012), *available at* http://www.dhs.gov/sites/default/files/publications/immigration-*statistics/table41d.xls.*

2. The Immigration and Nationality Act now provides a statutory mechanism for designating a country of removal when the United States is at war. *See* section 241(b)(2)(F) of the Act.

3. Whenever acceptance of the receiving state is required by statute, the Secretary of Homeland Security has regulatory discretion "to determine . . . what constitutes sufficient acceptance." 8 C.F.R. § 241.15(b). Unless otherwise mandated by statute or case law, the Secretary is not required to obtain acceptance "prior to designation of the receiving country, before travel arrangements are made, or before the alien is transported to the receiving country." 8 C.F.R. § 241.15(d).

4. *See supra* note 3.

5. There was previously a circuit split as to whether there was "an implicit requirement in each of the first six clauses of subsection (E) that the designated country be willing to accept the alien." *El Himri*, 378 F.3d at 939 n.4 (comparing *Ali v. Ashcroft*, 346 F.3d 873, 881-82 (9th Cir. 2003) (acceptance required), with *Jama v. INS*, 329 F.3d 630, 633 (8th Cir. 2003) (acceptance not required)).

6. An alien's right to due process may be violated, however, when he or she "has had no opportunity to address his or her fear of persecution in [the designated] country." *Zayed v. Gonzales*, 139 F. App'x 689, 692-93 (6th Cir. 2005) (citing *Kuhai v. INS*, 199 F.3d 909, 913-14 (7th Cir. 1999); *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999)). *But see Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir. 2005) (stating that the aliens' rights were not violated when they were "given ample notice and an opportunity to be heard on the issue of Russia as a potential country of deportation"); *Su Hwa She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010) (holding that an alien is "not entitled to adjudication of an application for withholding of removal to a country that nobody is trying to send them to"). *See generally Matter of Sagasti*, 13 I&N Dec. 771, 773 (BIA 1971) ("Notification of [the] right [to apply for withholding of removal] is not compelled with respect to the country 'designated' by the alien . . . .").

**EOIR Immigration Law Advisor**

**David L. Neal, Chairman**
*Board of Immigration Appeals*

**Brian M. O'Leary, Chief Immigration Judge**
*Office of the Chief Immigration Judge*

**Jack H. Weil, Assistant Chief Immigration Judge**
*Office of the Chief Immigration Judge*

**Karen L. Drumond, Librarian**
*EOIR Law Library and Immigration Research Center*

**Carolyn A. Elliot, Senior Legal Advisor**
*Board of Immigration Appeals*

**Sarah A. Byrd, Attorney Advisor**
*Office of the Chief Immigration Judge*

**Layout: EOIR Law Library**